UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Christopher Robert Beaulieu,
a/k/a/ Crystal Beaulieu

   v.                                                       Civil No. 15-cv-012-JD

Craig Orlando et al.

**REPORT AND RECOMMENDATION**

Plaintiff Christopher "Crystal" Beaulieu, a New Hampshire State Prison ("NHSP") inmate, has filed two motions (Doc. Nos. 62, 66) seeking preliminary injunctive relief.[1] Both motions were referred to the undersigned magistrate judge for proposed findings and recommendations as to disposition. The court held a hearing on Beaulieu's motions for injunctive relief on November 21, 2016 ("November 21 hearing").

**Background**

I. **Requested Injunction**

In this action, Beaulieu has asserted seven claims, alleging violations of her rights under the Eighth Amendment and state law against NHSP officials, arising out of events that

---

[1] Plaintiff is an inmate at the New Hampshire State Prison who identifies herself as a transsexual female. Her preference is to be referred to with feminine pronouns, and the court will honor that preference.

have occurred during Beaulieu's incarceration at the NHSP. Those incidents include: (1) an alleged incident of officers' use of excessive force against Beaulieu on March 7, 2012; (2) alleged sexual assaults by another inmate on April 18, 2014 and April 30, 2014; and 3) the alleged failure of prison officials to protect Beaulieu from known risks of physical and/or sexual violence, on April 18, 2014 and April 30, 2014.

In the instant motions for preliminary injunctive relief, Beaulieu states that she is being improperly and unconstitutionally housed in a single cell or a dayroom, and that prison officials have improperly placed a "Keep Away" directive preventing Beaulieu from having any contact with her romantic partner, Steven Newcombe, who is also an inmate at the NHSP.  Beaulieu claims that these actions constitution discrimination against her because she is a transsexual, retaliation for filing lawsuits and other complaints against prison officials, and that they violate her First Amendment right to intimate association.  In her motions, and as clarified at the November 21 hearing and in a written "Closing Statement" (Doc. No. 91), submitted after the hearing at the court's invitation, Beaulieu seeks a court order directing the defendants: 1) not to house plaintiff in a single cell, and allow her to be housed with an appropriate cellmate; 2) not to

2

house plaintiff in a dayroom; and 3) to remove the "Keep Away" directive and allow plaintiff to have contact with Steven Newcombe.

## II. Proposed Findings of Fact

Based on the credible evidence presented at the November 21 hearing, the stipulations of the parties entered for the purpose of resolving the preliminary injunction motions, and the portions of the record that are undisputed, the undersigned magistrate judge proposes that the district judge find the following facts to have been established, for the purpose of considering Beaulieu's request for a preliminary injunction:

A. Plaintiff's Housing in the Special Housing Unit

- Plaintiff Christopher Beaulieu, also known as Crystal Beaulieu, is a transsexual individual who has been incarcerated at the NHSP since 2011.

- Beaulieu is housed in the NHSP's Special Housing Unit ("SHU"), a "C-5" (maximum security) unit, although Beaulieu is classified as a C-4 (close custody) inmate. C-4 inmates at the NHSP are generally housed in that facility's Close Custody Unit ("CCU"). At the time of the November 21 hearing, Beaulieu was housed in SHU as a protective custody inmate, as Beaulieu has articulated safety issues concerning other inmates that prevent her from being housed in the CCU.

- There are ninety-six cells in SHU. Those cells are divided into twelve separate housing tiers.[2] SHU inmates generally fall into five categories: (1) maximum security inmates, who are housed in single

---

[2]A thirteenth tier in SHU houses inmate workers, called "trustees," who do janitorial work in SHU.

   cells; (2) inmates serving disciplinary sanctions in punitive segregation, who are housed in single cells; (3) inmates waiting for administrative review, disciplinary proceedings, or who have been involved in incidents in which an investigation is pending, who may be placed alone in a cell until their safety needs can be determined and/or to protect the integrity of an investigation; and (4) "protective custody" inmates, housed in SHU for their own safety, who can be celled either in single cells, or in a cell with another protective custody inmate.

- At the time of the November 21 hearing, there were at least sixty-three "C-5" maximum security inmates, and approximately sixteen inmates serving time in punitive segregation in SHU, all of whom had to be housed in single cells. Accordingly, at that time, there were no more than seventeen cells available to house all of the other inmates assigned to SHU.

- In SHU, housing assignments are generally made by the first shift Officer-in-Charge ("OIC"). Those decisions include: the tier and cell to which an inmate is assigned; whether an inmate is single-celled or double-celled; whether an inmate must be housed in a dayroom; and cellmate pairings. Five days a week, the first shift OIC for SHU is Sgt. Gary Lydick.

- In making housing assignments in SHU, Sgt. Lydick considers a number of factors in determining where an inmate may be appropriately housed, including: the reason an inmate is at SHU; an inmate's custody level; the tone, population, and behavior on each tier; whether any "Keep Away" directive concerning another SHU inmate prevents an inmate's placement on a particular tier; and the "Quay level" of an inmate, i.e., the extent to which an inmate is classified either as "predator" or "prey" in relation to other inmates.

- SHU inmates who cannot be housed with a cellmate for safety and/or security reasons are sometimes temporarily placed in a SHU dayroom, when there is no available single cell in the unit.

4

- When housed in a SHU dayroom, unlike when housed in a cell, inmates sleep on a mattress on the floor.  There are no bathroom facilities in SHU dayrooms, and inmates must be escorted out of the dayroom to use the bathroom by an officer who is making rounds every thirty minutes, or if the inmate can otherwise get the attention of an available officer.  SHU dayrooms are not as private as single cells.

- There is no written policy or memorandum establishing a so-called "single cell status" at the New Hampshire Department of Corrections ("DOC") in general, or at SHU, beyond the general rule that C-5 inmates and inmates in punitive segregation are always housed in single cells, that either mandates or prohibits other inmates' placement in a single cell.

- At the time of the hearing in this matter, Beaulieu was housed in a single cell in SHU.

- In the six-month period beginning May 1, 2016 and ending October 31, 2016, Beaulieu was housed with nine different cellmates, for periods of time ranging from two to eleven days.  During that six-month period, Beaulieu was housed: for fifty-four days in a cell with a cellmate; for three days in the NHSP Health Services Center; for twenty-eight days, alone in a dayroom; and for ninety-five days, alone in a cell.

- New Hampshire Department of Corrections ("DOC") Classifications Department officials may issue a "Keep Away," which is a directive requiring that two or more specific inmates be housed and/or supervised in a manner ensuring that the inmates subject to the "Keep Away" do not have contact with one another.  A prison official may request that the DOC Classifications Department issue a "Keep Away" where contact between particular inmates poses a threat to the safety and security of either particular inmates or to the institution generally.

- At the time of the November 21 hearing, "Keep Away" directives were in place specifically preventing contact between Beaulieu and approximately ten other

5

>    SHU inmates, significantly limiting the location in
>    SHU in which Beaulieu could be safely housed.
>
> - In the past, SHU officials have been willing to house Beaulieu with another inmate if three requirements were met: 1) Beaulieu is comfortable being housed with the other inmate; 2) the other inmate is comfortable being housed with Beaulieu; and 3) prison officials are confident that the pairing will not pose any danger to the safety and security of Beaulieu, the other inmate, or the institution, and that there would be no sexual contact between the inmates. In the past, Beaulieu has been housed in SHU with cellmates when those requirements were met.
>
> - At the time of the November 21 hearing, Sgt. Lydick, DOC Professional Standards Director Colon Forbes, and the DOC Prison Rape Elimination Act Advocate Jean Carroll, had concluded that Beaulieu should be housed in a single cell for her safety. Those officials' concern for Beaulieu's safety was based largely on Beaulieu having reported, on multiple occasions, being sexually assaulted by other inmates, causing prison officials to believe that Beaulieu was at a high risk of sexual victimization, and the fact that at least four of Beaulieu's reports of sexual assault were made against a cellmate.
>
> - On each occasion when Sgt. Lydick placed Beaulieu in a SHU dayroom, he did so because there was no available single cell in SHU in which Beaulieu could be safely housed, or in which Beaulieu agreed to be housed. On one occasion, Beaulieu was offered the opportunity to move from the dayroom to a single cell on a punitive segregation tier, but refused the offer because she did not want to live in the conditions associated with punitive segregation, resulting in Beaulieu having to spend additional time housed in a dayroom.
>
> - Sgt. Lydick has never placed Beaulieu in a single cell or in a dayroom in retaliation for Beaulieu having filed a lawsuit or complaint against anyone at the prison.

- Sgt. Lydick has never placed Beaulieu in a single cell to discriminate against Beaulieu because she is a transsexual.

B. <u>Policies Concerning Romantic or Sexual Relationships Between DOC Inmates</u>

- DOC inmates are not allowed to have sexual contact with one another, consensual or otherwise, during their incarceration, per DOC policy.

- Sexual contact between inmates poses a potential threat to the safety and security of inmates and the institution, as it is difficult or impossible for prison officials to distinguish between genuinely consensual sexual contact, and sexual contact which has been coerced by force or threats of force.

- In the prison context, sexual acts between inmates that appear consensual can result in extortion or blackmail, or can be used as payment for goods or services.

- If a prison official believes that inmates at the DOC are involved in a romantic and/or sexual relationship with one another, the official may seek a "Keep Away" on that basis.

- Inmates involved in a romantic nonsexual relationship are not allowed to have contact with one another, because the relationship could result in sexual contact between the inmates, and because the souring of a romantic relationship can create tension or other difficulties within the facility, and create a risk to the safety and security of the inmates and the institution.

C. <u>Plaintiff's Relationship with Steven Newcombe</u>

- At the time Beaulieu filed her requests for preliminary injunctive relief, she was engaged to be married to Steven Newcombe, a NHSP inmate. The

7

   relationship between Beaulieu and Newcombe was
   romantic, but not sexual.  At the time of the November
   21 hearing, Beaulieu and Newcombe had split, but were
   attempting to rekindle their romantic relationship.[3]

- In July 2016, when both Beaulieu and Newcombe were
  housed in the NHSP's Reception and Diagnostic Unit
  ("R&D"), R&D Unit Manager Kathleen Anderson came to
  believe, based on her own observations and information
  from other officers, that Beaulieu and Newcombe were
  either in a romantic and/or sexual relationship, or
  intended to pursue such a relationship with one
  another.

- Unit Manager Anderson, upon becoming aware of a
  potential romantic relationship between Beaulieu and
  Newcombe, had the DOC Classifications Department issue
  a "Keep Away" for Beaulieu and Newcombe.

- At the time of the November 21 hearing, as a result of
  the "Keep Away," Beaulieu and Newcombe were not able
  to have any contact with one another.

- The "Keep Away" placed significant strain on
  Beaulieu's relationship with Newcombe.

- Between the filing of the preliminary injunction
  motions and the November 21 hearing, Beaulieu became
  jealous of Newcombe's contact with another inmate.  In
  a "jealous rampage," Beaulieu falsely accused Newcombe
  of sexually assaulting her.  Beaulieu has since
  admitted that the accusation was false and received
  disciplinary consequences for the false allegation.

- Beaulieu and Newcombe, at the time of the November 21
  hearing, were attempting to rekindle their romantic
  relationship.  The "Keep Away" has made that effort
  difficult.

---

[3]Information that has come before the court since the hearing in this matter indicates that Beaulieu and Newcombe have again entered into a romantic relationship.  The current status of their relationship is not material to the court's recommended disposition of the motions for preliminary injunction.

8

    D.    <u>Beaulieu's History of Consensual and Nonconsensual Sexual Contact at the Prison</u>

- As of the date of the hearing, Beaulieu, by her own count, had filed thirteen reports alleging that she had been sexually assaulted at the prison since 2011. Each of the reported sexual assaults was investigated by the DOC Investigations Bureau.

- One of the thirteen sexual assaults Beaulieu reported was deemed to be "unfounded," or untrue, upon investigation. The rest of Beaulieu's sexual assault allegations were "unsubstantiated," in that the matter was investigated, but the investigators could not determine whether the allegation was true or false.

- During her incarceration, Beaulieu has engaged in sexual contact with a number of inmates that did not result in sexual assault allegations. Included in that sexual contact were, as described by Beaulieu: mutually consensual sexual encounters; instances of Beaulieu agreeing to engage in sexual acts in exchange for canteen items; participation in a "turn out" group, comprised of Beaulieu and other transsexual inmates, who would engage in sexual acts with inmates who claimed to be heterosexual, and would then identify those inmates to the other members of the "turn out" group.

## Discussion

**I.   Preliminary Injunction Standard**

"'A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" <u>Glossip v. Gross</u>, 135 S. Ct. 2726, 2736 (2015) (citation omitted); <u>see also</u>

Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 171 (1st Cir. 2015). "Though each factor is important . . . 'the sine qua non of [the] four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'" Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (citation and alterations omitted). "To demonstrate likelihood of success on the merits, [a] plaintiff[] must show more than mere possibility of success – rather, [he] must establish a strong likelihood that [he] will ultimately prevail." Id. (internal quotation marks and citations omitted); see also Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006) ("if the moving party cannot demonstrate that he is likely to succeed in his quest," preliminary injunctive relief is properly denied without further analysis). The burden of proof is on the movant. See Esso Std. Oil Co., 445 F.3d at 18.

**II. Likelihood of Success on the Merits**

    A. Claims Not in this Action

As previously stated, the claims in this case arise out of alleged violations of Beaulieu's Eighth Amendment rights, and related state law claims. Plaintiff's request for preliminary

10

injunctive relief seek redress for claims that are not before the court in this action. Beaulieu seeks preliminary injunctive relief to redress claims asserting an equal protection violation for discrimination based on her transsexuality, retaliation against her for exercising her First Amendment rights to file lawsuits and complaints against prison officials, and a violation of her First Amendment right to intimate association.

As stated above, likelihood of success on the merits is a necessary showing to obtain preliminary injunctive relief. See Sindicato Puertorriqueño de Trabajadores, 699 F.3d at 10; Esso Standard Oil Co., 445 F.3d at 18. Beaulieu cannot demonstrate that she is likely to succeed on the merits of claims that are not before the court in this action, and her request for preliminary injunctive relief is subject to denial on that basis. Even if the discrimination, retaliation, and intimate association claims were properly before the court in this matter, however, Beaulieu's request for a preliminary injunction would fare no better, as Beaulieu has failed to demonstrate a likelihood that she could succeed on the merits of those claims, for reasons discussed below.

    B.   <u>Discrimination</u>

"'The Equal Protection Clause contemplates that similarly situated persons are to receive substantially similar treatment

11

from their government.'"  Davis v. Coakley, 802 F.3d 128, 132 (1st Cir. 2015) (citation omitted).  "To establish an equal protection claim, a plaintiff needs to allege facts showing that '(1) the [plaintiff], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure [the plaintiff].'"  Id. at 132-33 (citation omitted).  "Proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."  Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265 (1977).

   Beaulieu asserts here that her placement in a single cell constitutes unfavorable treatment motivated by discrimination against her because she is transsexual, as compared to the treatment received by nontranssexual inmates who are otherwise similarly situated to her.  The evidence at the hearing demonstrated, however, that to the extent prison officials have treated Beaulieu differently, in housing placement decisions, than they have nontranssexual inmates, that difference is based on the higher risk of sexual victimization to which her identity as a transsexual places her in SHU.  Prison officials'

12

conclusions concerning Beaulieu's heightened risk of sexual victimization were based on their knowledge that Beaulieu has reported being sexually assaulted numerous times at the prison. One prison official testified at the hearing that Beaulieu had reported being sexually assaulted at the prison more times than any other inmate of which the official was aware.

No evidence before the court supports Beaulieu's assertion that prison officials have made housing decisions to discriminate against her, or on the basis of any ill will they may bear for her, due to her transsexuality.  Further, the evidence at the hearing showed that both transsexual and nontranssexual inmates are placed in single cells, where such housing is necessary to protect an inmate's safety.

As to housing in dayrooms, while the lack of privacy an inmate experiences while housed in a dayroom might be generally more troubling to a transsexual inmate than a nontranssexual inmate, the evidence showed that both transsexual and nontranssexual inmates who prison officials have determined need to be housed alone for safety reasons, are placed in dayrooms in SHU when overcrowding issues have resulted in a shortage of available single cells.  The evidence at the hearing showed that Beaulieu was not treated differently than any other inmate in that regard, and that on the occasions she was housed in a

13

dayroom she was offered placement in a single cell as soon as one became available.

No evidence before the court demonstrates that any decision to place Beaulieu in a dayroom was made with discriminatory purpose or intent. Accordingly, Beaulieu has failed to show that she would be likely to succeed on a claim that prison officials violated her equal protection rights by discriminating against her in housing placement decisions.

C. Retaliation

Beaulieu claims that prison officials placed her in a single cell to retaliate against her for filing lawsuits and other complaints against prison officials. To demonstrate retaliation, Beaulieu must show: (1) that she engaged in conduct protected by the First Amendment; (2) that she suffered non-de minimis adverse action at the hands of the prison officials; and (3) that there was a causal link between the exercise of her First Amendment rights and the adverse action taken. See Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011). An adverse act taken in response to an inmate's protected conduct is not de minimis if it would deter an inmate of ordinary firmness from exercising First Amendment rights. See Starr v. Dube, 334 F. App'x 341, 342 (1st Cir. 2009).

There is no dispute that, by filing complaints and lawsuits

against prison officials, Beaulieu engaged in conduct protected by the First Amendment.  Further, it is undisputed that Beaulieu was placed in a single cell, and separated from Newcombe by a "Keep Away," against her wishes, and, in that respect, was thus subjected to adverse acts.  For purposes of considering Beaulieu's request for a preliminary injunction, the court will assume that both the placement in a single cell and the "Keep Away" were adverse acts that were not de minimis.

Beaulieu has failed, however, to demonstrate facts to satisfy the third element of a retaliation claim, that it was her exercise of her First Amendment rights that motivated the housing decisions Beaulieu now asks the court to enjoin.  To the contrary, the evidence at the hearing demonstrated that Beaulieu's placements in a single cell, and occasionally in a dayroom, were effected for her own safety, as a protective custody inmate with a history of numerous sexual victimizations in prison, at least four of which were alleged to have been committed by cellmates.  Further, the evidence shows that the "Keep Away" concerning Beaulieu and Newcombe was issued in response to the prison officials' concerns that their romantic relationship could pose risks to the security of Beaulieu, Newcombe, and the institution.  No evidence before the court supports Beaulieu's assertions that either her placement in a

single cell or a dayroom, or the issuance of the "Keep Away," was retaliatory.  Accordingly, the record in this case fails to show that Beaulieu would be likely to succeed on a retaliation claim.

   D.   First Amendment Right of Association

   Liberally construed, Beaulieu's request for preliminary injunctive relief seeking an order from the court directing prison officials to vacate the "Keep Away" between her and Newcombe, arising from an alleged violation of Beaulieu's First Amendment right of intimate association.[4]  The First Amendment protects "two types of 'freedom of association' that merit constitutional protection: (i) 'choices to enter into and maintain certain intimate human relationships' and (ii) association 'for the purpose of engaging in those activities protected by the Frist Amendment.'"  URI Student Senate v. Town of Narragansett, 631 F.3d 1, 12-13 (1st Cir. 2011) (quoting Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18 (1984)).  While the right to intimate association is not necessarily entirely eliminated by incarceration, "freedom of association is among

---

   [4]To the extent Beaulieu has attempted to assert a violation of Newcombe's right to intimate association, she cannot do so, as she is not a lawyer, and thus cannot represent the interests of anyone other than herself in this court.  See 28 U.S.C. § 1654; LR 83.2(d).

the rights least compatible with incarceration," and thus, "[s]ome curtailment of that freedom must be expected in the prison context." Overton v. Bazzetta, 539 U.S. 126, 1312 (2003); see also Thornburgh v. Abbott, 490 U.S. 401, 410 n. 9 (1989) (holding that "legitimate penological interests" may circumscribe the associational rights of both prisoners and those who seek to associate with them).

The court will uphold a prison regulation or restriction alleged to have impinged an inmate's constitutional rights where the constitutional right in question is "'inconsistent with proper incarceration,'" Johnson v. California, 543 U.S. 499, 510 (2016) (quoting Overton, 539 U.S. at 131), and the restriction or regulation bears a reasonable relationship to a legitimate penological objective, see Overton, 539 U.S. at 132 (citing Turner v. Safley, 482 U.S. 78, 89 (1987)), provided the challenged restriction or regulation is not an "'exaggerated response' to such objective[]." Beard v. Banks, 548 U.S. 521, 528 (2006) (quoting Turner, 482 U.S. at 87). In evaluating such restrictions, the court "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Overton, 539 U.S. at 132. The

burden is on the inmate to disprove the validity of a challenged prison restriction.  See id.

The evidence at the November 21 hearing demonstrated that the DOC's policy of prohibiting romantic and sexual involvement between inmates is designed to prevent tensions, assault, blackmail, exploitation, and other problems that could jeopardize the safety and security of inmates or the institution.  Beaulieu does not dispute the legitimacy or validity of prison officials' interest in safety and security.  Instead, Beaulieu disputes that the "Keep Away" preventing contact between herself and Newcombe is reasonably related to that policy because, as Beaulieu asserts is the case with her and Newcombe, there have never been any violence, sexual assault, or other problems between herself and Newcombe that would create a safety or security risk.

Contrary to her contention, however, Beaulieu testified at the hearing that when her relationship with Newcombe was strained, that Beaulieu, in a "jealous rampage," falsely accused Newcombe of sexually assaulting her.  Although she ultimately recanted her accusation, and received disciplinary consequences for her false accusation, the incident demonstrates the legitimacy of the prison officials' concern for avoiding such conflict in the prison setting.  In addition, the hearing

18

testimony of prison officials concerning the potential problems associated with romantic and sexual relationships between inmates within a facility, demonstrated the reasonableness of such policies in general, and of the specific application of the policy to Beaulieu and Newcombe.

Because Beaulieu's contact with Newcombe has been restricted pursuant to a policy that is reasonably related to a legitimate penological objective, Beaulieu has not demonstrated that her right to intimate association has been unconstitutionally abridged. Accordingly, Beaulieu has not met her burden to demonstrate that she could likely succeed on the merits of such a claim to obtain the injunctive relief she seeks.

### III. **Other Preliminary Injunction Factors**

Beaulieu has failed to demonstrate a likelihood of success as to any of the claims, asserting violations of her rights, underlying her requests for injunctive relief. Accordingly, the court need not consider the remaining preliminary injunction factors.

### **Conclusion**

For the foregoing reasons, the district judge should find that Beaulieu has failed to meet her burden to demonstrate that

she is entitled to preliminary injunctive relief, and should deny her motions (Doc. Nos. 62, 66) seeking such relief. Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice. See Fed. R. Civ. P. 72(b)(2). The fourteen-day period may be extended upon motion. Failure to file specific written objections to the Report and Recommendation within the specified time waives the right to appeal the district court's order. See Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016); Fed. R. Civ. P. 72(b)(2).

                                                _____
                                                Andrea K. Johnstone
                                                United States Magistrate Judge

February 23, 2017

cc:   Christopher "Crystal" Beaulieu, pro se
       Laura E. B. Lombardi, Esq.